PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

EDWARD HUGLER, *etc.*,[1]          )
                                   )          CASE NO.  5:15CV1577
            Plaintiff,             )
                                   )          JUDGE BENITA Y. PEARSON
        v.                         )
                                   )
CATHEDRAL BUFFET, INC., *et al.*,  )          **FINDINGS OF FACT AND**
                                   )          **CONCLUSIONS OF LAW**
            Defendants.            )          [Resolving ECF Nos. 26 and 81]


Pursuant to his authority under the Fair Labor Standards Act of 1938, as amended, 29

U.S.C. § 201 *et seq.* ("FLSA" or "Act"), Plaintiff, Thomas E. Perez, Secretary of Labor, United

States Department of Labor ("Department of Labor") filed the above-entitled action against

Defendants Cathedral Buffet, Inc. ("Buffet") and Ernest Angley ("Reverend Angley") to enforce

the FLSA.

This action proceeded to trial before the Court without a jury on October 31, 2016,

November 1, 2016, and November 21, 2016.  Affiants Clay Ether, Leah Barrows, Wanda

Buckner, Lisa Poindexter, Xavier O. Smith, Zacharias Kostenko, Ellen M. Oborne, and Joshoua

Bell also testified during depositions conducted on November 10, 2016.  The Court has

considered the testimony of witnesses, exhibits admitted into evidence, arguments of counsel

(including the Post-trial Briefs (ECF Nos. 87 and 88), as well as the entire record in this matter.

---

[1]  Thomas E. Perez was the original Defendant.  He brought suit in an official
capacity as a public officer.  On January 20, 2017, Edward Hugler became the Acting
Secretary of Labor.  Pursuant to Fed. R. Civ. P. 25(d), Hugler's name has been
automatically substituted as a party.

(5:15CV1577)

Duly informed, the Court, herein, enters its findings of fact and conclusions of law in support of

the Judgment Entry.

**FINDINGS OF FACT**

1.  The Buffet is an Ohio for-profit corporation whose sole shareholder is Grace

Cathedral, Inc. ("Church").  Joint Undisputed Fact Stipulations (ECF No. 36) at PageID #: 1143-

44, ¶¶ 5, 7.[2]

2.  The Buffet operates a restaurant that is open to the public and is located in a Cuyahoga

Falls shopping district populated by many other eateries.  ECF No. 36 at PageID #: 1143-44, ¶¶

1, 3, 11, 12.

3.  The nearby eateries include Subway, Aladdin's Eatery, Arby's, and Taco Bell.  ECF

No. 36 at PageID #: 1144, ¶ 12.

4.  The Buffet's workers handle goods that have moved through commerce, such as

cooking oil from Grand Rapids, Michigan, and Tabasco sauce from Avery Island, Louisiana.

ECF No. 36 at PageID #: 1144, ¶ 13.

5.  The Buffet had an annual dollar volume of at least $500,000.  Answer (ECF No. 83) at

PageID #: 2237, ¶ 5; ECF No. 36 at PageID #: 1144, ¶¶ 14-16.

6.  Sonya Neale ("Neale") is the Buffet's manager.  ECF No. 36 at PageID #: 1144, ¶ 17.

7.  Neale has worked at the Buffet as the restaurant's manager for approximately twenty

years.  ECF No. 36 at PageID #: 1145, ¶ 19.

_____

[2]  The Stipulations were also read into the record during trial.  Trial Transcript
(ECF No. 85) at PageID #: 2312-19.

(5:15CV1577)

8.  Neale started working at the Buffet in 1996 as a banquet salesperson, and approximately nineteen years ago she was promoted to general manager by Reverend Angley. Trial Transcript (ECF No. 75) at PageID #: 1622-23.

9.  Neale has been the general manager ever since.  ECF No. 75 at PageID #: 1623.

10.  Neale was hired by Reverend Angley to serve as the general manager of the Buffet. ECF No. 75 at PageID #: 1623.

11.  Neale is responsible for most restaurant operations at the Buffet, including overseeing:  the staff and their duties, customer service, the Buffet's facilities, and maintenance. ECF No. 36 at PageID #: 1144, ¶ 18.

12.  Neale has also served as the Buffet's kitchen manager since 2004.  ECF No. 36 at PageID #: 1145, ¶ 19.

13.  Although Neale is the highest-level individual working day-to-day at the Buffet, she often relies upon Reverend Angley.  ECF No. 75 at PageID #: 1624.

14.  Neale has asked for Reverend Angley's input for Buffet-related matters.  ECF No. 36 at PageID #: 1145, ¶ 20.

15.  Neale has also sought his advice on handling customers, dealing with workers, and regarding the Buffet's menu.  ECF No. 36 at PageID #: 1145, ¶ 21.

16.  Reverend Angley himself has hired individuals to work at the Buffet, and he has directed Neale to hire specific individuals.  ECF No. 36 at PageID #: 1145, ¶ 22; ECF No. 75 at PageID #: 1624, 1647, 1735.

3

(5:15CV1577)

17. Neale has also sought Reverend Angley's advice on whether to fire workers. ECF No. 36 at PageID #: 1145, ¶ 23.

18. Reverend Angley testified that Neale has never done something *against* his recommendations. ECF No. 75 at PageID #: 1707.

19. Two former volunteers and employees of the Buffet, Rebecca Roadman and Christopher Newby, testified that Reverend Angley was Neale's supervisor. ECF No. 75 at PageID #: 1650; Trial Transcript (ECF No. 76) at PageID #: 1803, 1806.

20. Reverend Angley is the president of the Buffet (Plaintiff's Exhibit 18; ECF No. 76 at PageID #: 1876-77), and is very involved with and plays a vital role in the management of the Buffet (*see* ECF No. 75 at PageID #: 1695-1714).

21. In 2012, Reverand Angley made the decision to start using unpaid volunteers at the Buffet again. ECF No. 75 at PageID #: 1696-97; Deposition of Ernest Angley (ECF No. 28-11) at PageID #: 1038.

22. Reverend Angley regularly called for Church members to work at the Buffet, and even directly contacted volunteers in an attempt to recruit them to work at the Buffet. ECF No. 75 at PageID #: 1605, 1768-69.

23. Neale would seek Reverend Angley's advice on hiring individuals. ECF No. 75 at PageID #: 1706-1707.

24. Neale would never refuse to give Reverend Angley access to employee records, if he were to request them. ECF No. 75 at PageID #: 1707.

4

(5:15CV1577)

25.  Reverend Angley would be consulted about the Buffet's menu and had final authority once he made a decision.  ECF No. 75 at PageID #: 1707.

26.  Reverend Angley could also have access to the Buffet's checkbook and checking account, if he wanted.  ECF No. 75 at PageID #: 1718.

27.  Reverend Angley's significant role within the Buffet is apparent, given his concerns that "we were spending so much money . . . it was hundreds of thousands of dollars that we were spending to keep [the Buffet] open."  ECF No. 75 at PageID #: 1698.

28.  The Buffet's finance manager, Cathy Shupe, testified that she would need to speak with Reverend Angley regarding Church money that needed to be spent on the Buffet's operating expenses, "[b]ecause he would know what would need to be budgeted."  ECF No. 75 at PageID #: 1726-27; ECF No. 85 at PageID # 2363, 2367.

29.  When the Wage and Hour Division for the Department of Labor ("Wage and Hour") commenced its investigation in November 2014, the Buffet maintained two different classes of workers:  "employees" and "volunteers."  ECF No. 36 at PageID #: 1146, ¶ 30.

30.  The employees were responsible for cooking, cleaning tables, serving customers, baking, salads prep, and working as cashiers.  ECF No. 36 at PageID #: 1146, ¶ 31.

31.  The individuals classified as employees by the Buffet were paid an hourly wage.  ECF No. 36 at PageID #: 1146, ¶ 32.

32.  The volunteers were responsible for similar restaurant-related tasks, such as: cleaning; bussing tables; scraping dishes; wiping down, organizing, and stocking the beverage

(5:15CV1577)

stations; serving cake; stocking condiments; chopping vegetables; and operating the cash registers. ECF No. 36 at PageID #: 1146, ¶ 33.

33.  Volunteers worked in the dish room or could work the cash registers. ECF No. 36 at PageID #: 1146, ¶¶ 34, 40; ECF No. 75 at PageID #: 1602.

34.  Angela Oborne testified that the only department that never used a volunteer was the position of manager. ECF No. 75 at PageID #: 1735.

35.  During Wage and Hour's investigation period, the individuals classified as volunteers by the Buffet were paid no wages for their work. ECF No. 36 at PageID #: 1146, ¶ 35.

36.  For a customer, there was no obvious way to distinguish an employee from a volunteer. ECF No. 75 at PageID #: 1627, 1649; ECF No. 76 at PageID #: 1818.

37.  Angela Oborne, a twenty-year veteran worker and/or volunteer at the Buffet, who was responsible for scheduling volunteers and paid staff, could not recall a single instance when the Buffet was staffed with only paid employees and without any volunteers. ECF No. 75 at PageID #: 1740.

38.  The Buffet actively solicited volunteers to work at the Buffet by having Reverend Angley make announcements prior to his sermons. ECF No. 36 at PageID #: 1146, ¶ 36; ECF No. 75 at PageID #: 1695.

39.  Neale would notify Reverend Angley or his secretary that the Buffet needed additional help, and Angley would make the announcement to the Church congregation. ECF No. 75 at PageID #: 1626.

(5:15CV1577)

40.  In his announcements, Reverend Angley would suggest that Church members had an obligation to provide their labor to the Buffet, in service to God, and that a failure to offer their labor to the Buffet – or to refuse to respond to phone calls from Stacey McClintock seeking volunteers – would be the same as failing God.  ECF No. 75 at PageID #: 1605-1607, 1656-57; ECF No. 76 at PageID #: 1814, 1816, 1836-38, 1854-55, 1939; Trial Transcript (ECF No. 78) at PageID #: 2061-62.  Reverend Angley would thus coerce Church members into agreeing to volunteer at the Buffet.

41.  Ralph Gay, III testified that he felt Reverend Angley thus used "scare tactics/bullying" and made "people feel bad" for not working at the Buffet.  ECF No. 76 at PageID #: 1855.

42.  As Dr. Alishea Gay explained, Reverend Angley preached that he was God's prophet, and saying "no" to Angley would be tantamount to saying "no" directly to God.  ECF No. 75 at PageID #: 1607-1608.

43.  Reverend Angley also preached that repeatedly saying "no" to God or failing God ultimately leads to a person "blaspheming against the Holy Ghost," which meant that the individual's connection to God has been lost and was irredeemable.  ECF No. 75 at PageID #: 1606-1608; ECF No. 76 at PageID #: 1814, 1816-17.

44.  Church members were pressured or coerced into volunteering at the Buffet.  ECF No. 75 at PageID #: 1606, 1615-16; ECF No. 76 at PageID #: 1939, 1941.

45.  Angela Oborne, who was once responsible for preparing schedules and recruiting volunteers for the Buffet, was instructed by Neale to make it hard for volunteers to call off from

7

(5:15CV1577)

their scheduled shifts.  She was likewise instructed by Neale to tell prospective volunteers that Reverend Angley would find out if they refused to work at the Buffet when called.  ECF No. 75 at PageID #: 1737, 1782-83.

46.  Neale or McClintock called Church members and scheduled them for volunteer shifts on specific days and times at the Buffet.  ECF No. 36 at PageID #: 1146, ¶ 37; ECF No. 75 at PageID #: 1604, 1626, 1655-56; ECF No. 76 at PageID #: 1813, 1822, 1834-35; ECF No. 78 at PageID #: 2001, 2061, 2088.

47.  Neale and McClintock ensured that the Buffet was sufficiently staffed on a given day. ECF No. 36 at PageID #: 1146, ¶ 38.

48.  Neale was also responsible for training and delegating work to the volunteers.  ECF No. 36 at PageID #: 1146, ¶ 39.

49.  If the Buffet did not have volunteers, the volunteers' work would instead be completed by the paid employees.  ECF No. 75 at PageID #: 1628-32; Deposition of Sonya Neale (ECF No. 28-10) at PageID #: 951-52.

50.  Paid employees also worked in the dish room, at the cash register, and stocking the buffet line, just as the volunteers did.  ECF No. 36 at PageID #: 1146, ¶ 40; ECF No. 75 at PageID #: 1700.

51.  The volunteers' work was managed and controlled by Neale or McClintock.  ECF No. 36 at PageID #: 1147, ¶ 41; ECF No. 75 at PageID #: 1627.

52.  The volunteers had no opportunity to make a profit.  ECF No. 36 at PageID #: 1147, ¶ 42.

8

(5:15CV1577)

53.  Former employee and volunteer, Christopher Newby, testified that he would have liked to have kept the tips, but could not do so.  ECF No. 76 at PageID #: 1804.

54.  The volunteers who provided affidavits in support of the Employers' Motion for Summary Judgment (ECF No. 26) had no expectation that they would receive wages or any other type of compensation for their volunteer services at the Buffet.  ECF No. 36 at PageID #: 1147, ¶ 43.

55.  None of the volunteers who provided affidavits in support of the Employers' Motion for Summary Judgment (ECF No. 26) was economically dependent on the Buffet.  ECF No. 36 at PageID #: 1147, ¶ 44.

56.  Neither the Buffet nor Reverend Angley ever economically supported any of the volunteers who provided affidavits in support of the Employers' Motion for Summary Judgment (ECF No. 26) by providing them with cash or non-cash wages, food, shelter, clothing, or any other means of sustenance."  ECF No. 36 at PageID #: 1147, ¶ 45.

57.  Zacharias Kostenko testified that he was pressured into signing his affidavit (ECF No. 26-63) in support of the Employers' Motion for Summary Judgment (ECF No. 26).  ECF No. 78 at PageID #: 2063.

58.  The volunteers did not need any special skills to accomplish the tasks for which they volunteered.  ECF No. 36 at PageID #: 1148, ¶ 52; ECF No. 75 at PageID #: 1628.

59.  Volunteers made no investment in equipment or materials.  ECF No. 75 at PageID #: 1604; ECF No. 76 at PageID #: 1833-34.

(5:15CV1577)

60. By using unpaid volunteer labor, the Buffet and Reverend Angley sought to save money and avoid paying wages to the paid staff. ECF No. 75 at PageID #: 1700.

61. The Buffet can offer low cost meals because it does not pay all of its workers.

62. The Buffet does not primarily serve a religious purpose.

63. On February 25, 2013, the Buffet was incorporated in Ohio. ECF No. 36 at PageID #: 1143, ¶ 2.

64. Prior to February 2013, the Buffet was owned by the Winston Broadcasting Network, Inc. ("Winston"). ECF No. 36 at PageID #: 1143, ¶ 4.

65. The Church is the sole shareholder of both Winston and the Buffet. ECF No. 75 at PageID #: 1725-26.

66. Many aspects of the Buffet have remained constant for the past nineteen years. For example:

- The name of the restaurant has always been "Cathedral Buffet;"

- The management structure has remained the same;

- Neale's method of doing her job has remained the same;

- The Buffet's location has remained the same;

- There has been no significant change in the workforce;

- The Buffet has used the same equipment;

- The Buffet has used the same facilities; and,

- The Buffet has remained open to the public.

ECF No. 75 at PageID #: 1632-33.

10

(5:15CV1577)

67.  Wage and Hour's first investigation of the Buffet occurred in 1999, when Wage and Hour discovered that the Buffet was misclassifying workers as volunteers and paying them no wages, in violation of Section 6 of the FLSA, 29 U.S.C. § 206.  ECF No. 76 at PageID #: 1901-1902, 1908; Plaintiff's Exhibit 8.

68.  Wage and Hour also found in 1999 that the Buffet had been employing a minor in violation of Section 12 of the Act, 29 U.S.C. § 212, had failed to maintain accurate records as required by Section 11 of the Act, 29 U.S.C. § 211, and had failed to pay overtime to one non-exempt employee, in violation of Section 7 of the Act, 29 U.S.C. § 207.  ECF No. 76 at PageID #: 1908-1909; Plaintiff's Exhibit 8.

69.  The Buffet paid $37,037.28 in back wages and agreed to future compliance with the Act.  ECF No. 76 at PageID #: 1910, 1926; Plaintiff's Exhibit 8.

70.  Reverend Angley understood that through the 1999 investigation, Wage and Hour had taken the position that it was inappropriate to use volunteer labor at the Buffet.  ECF No. 75 at PageID #: 1705; ECF No. 28-11 at PageID #: 1055-56.

71.  Neale was also involved in the 1999 Wage and Hour investigation of the Buffet by meeting with the Wage and Hour investigator and providing documents and records to the investigator.  ECF No. 75 at PageID #: 1633-34, 1636.

72.  Neale did so as general manager of the Buffet.  ECF No. 75 at PageID #: 1634.

73.  In 2003, Wage and Hour returned to the Buffet as a part of the agency's recidivism initiative.  ECF No. 76 at PageID #: 1910-12; Plaintiff's Exhibit 9.

(5:15CV1577)

74.  The 2003 investigation disclosed no violations because the Buffet appeared to be paying all of its workers as required by the FLSA.  ECF No. 76 at PageID #: 1913; Plaintiff's Exhibit 9.

75.  Multiple witnesses testified that there was a time period, prior to 2012, when paychecks were being issued to the volunteers.  ECF No. 75 at PageID #: 1611, 1646-47, 1761-63; ECF No. 76 at PageID #: 1842-44; ECF No. 78 at PageID #: 1994, 2064.

76.  According to Dr. Gay, a meeting of Buffet volunteers was convened, and Reverend Angley indicated that due to financial hardships, volunteers would need to give back the paychecks that they were issued.  ECF No. 75 at PageID #: 1611.

77.  Angela Oborne often witnessed Reverend Angley encouraging volunteers to return their paychecks to the Church.  ECF No. 75 at PageID #: 1763.

78.  Volunteers were expected to endorse the paychecks in front of the Church secretary, Debbie Witzky, who would then hold on to those checks.  ECF No. 75 at PageID #: 1611, 1646-47, 1763; ECF No. 76 at PageID #: 1842-44; ECF No. 78 at PageID #: 1994, 2064.

79.  Witnesses testified that they could not keep the checks.  ECF No. 75 at PageID #: 1611-12; ECF No. 76 at PageID #: 1844, 1847.

80.  Clay Ether, one of the volunteers who provided an affidavit (ECF No. 39-5) in support of the Employers' Motion for Summary Judgment (ECF No. 26), testified that he would sign checks back over to the Church, and he did not have the option of keeping those checks.  ECF No. 78 at PageID #: 1996.

(5:15CV1577)

81. Even though they could not keep those paychecks, at least Dr. Gay and Ralph Gay, III testified that they were still responsible for paying taxes on those phantom "earnings." ECF No. 75 at PageID #: 1612; ECF No. 76 at PageID #: 1846-47.

82. On October 19, 2014, the *Akron Beacon Journal* published an article (Plaintiff's Exhibit 12) suggesting that the Buffet may have reverted to employing workers in violation of the FLSA. ECF No. 76 at PageID #: 1860.

83. In that article, Reverend Angley admitted that the Buffet returned to using volunteers, despite Wage and Hour's prior investigation. Plaintiff's Exhibit 12.

84. Wage and Hour therefore opened its investigation in November 2014. ECF No. 36 at PageID #: 1145, ¶ 24.

85. The investigation reviewed the Buffet's employment practices from November 5, 2012 through November 2, 2014 (the "Investigation Period"). ECF No. 36 at PageID #: 1145, ¶ 25.

86. The investigation that began in November 2012 revealed that the Buffet had indeed reverted to practices similar to the ones that were discovered during the 1999 investigation, *i.e.*, the use of unpaid volunteers. ECF No. 76 at PageID #: 1868.

87. The Buffet also and again failed to maintain records of the volunteers' work. Specifically, the Buffet did not maintain records of the daily hours worked by each volunteer. ECF No. 76 at PageID #: 1891-92.

88. Stephen Banig, an investigator for the Department of Labor's Wage

13

(5:15CV1577)

and Hour Division, calculated that the Buffet owes $194,253.95 in back wages to the volunteers.

ECF No. 85 at PageID #: 2281; Plaintiff's New/Amended Exhibit 10.

89.  Plaintiff initiated this lawsuit by filing the Complaint (ECF No. 1) on August 10,

2015.  Because the Complaint (ECF No. 1) was filed after June 15, 2015, the parties agreed (by

virtue of a Tolling Agreement (ECF No. 88-1)) that they would deem the Complaint (ECF No. 1)

to have been filed 90 days before the actual filing date.  Thus, the statute of limitations period is

calculated from May 10, 2015.

**CONCLUSIONS OF LAW**

**I.  Jurisdiction**

1.  Sections 16 and 17 of the Act, 29 U.S.C. §§ 216 and 217, and 28 U.S.C. §§ 1337 and

1345 grant district courts jurisdiction to adjudicate violations of the Act and to restrain violations

of Section 15 of the Act, 29 U.S.C. § 215, including to restrain the withholding of payment of

wages found due by a court as a result of violations of the Act.

2.  Plaintiff asserts in the Amended Complaint (ECF No. 82 at PageID #: 2190), and

Defendants admitted in their Answer (ECF No. 83 at PageID #: 2236), the jurisdiction of this

Court pursuant to Sections 16(c) and 17 of the Act and 28 U.S.C.§ 1345.

**II.  Coverage**

3.  An enterprise engaged in commerce is a business that has employees handling or

selling goods that have been moved in commerce and that has an annual dollar volume of sales of

at least $500,000.  29 U.S.C. § 203(s)(1)(A).

14

(5:15CV1577)

4. The Act has consistently been construed to apply liberally to the "furthest reaches," and its language "contains no express or implied exception for commercial activities conducted by religious or other nonprofit organizations." *Tony & Susan Alamo Found. v. Sec'y of Labor,* 471 U.S. 290, 296 (1985).

5. Department of Labor regulations specify that "[a]ctivities of [an] eleemosynary, religious, or educational organization may be performed for a business purpose." 29 C.F.R. § 779.214.

6. The Supreme Court therefore noted that there was "broad congressional consensus that ordinary commercial business should not be exempted from the Act *simply because they happened to be owned by religious or other nonprofit organizations*." *Tony & Susan Alamo Found.*, 471 U.S. at 298 (emphasis added).

7. As the appellate court in *Tony & Susan Alamo Found.* noted, "[b]y entering the economic arena and trafficking in the marketplace, the foundation has subjected itself to the standards Congress has prescribed for the benefit of employees." *Donovan v. Tony & Susan Alamo Found.*, 722 F.2d 397, 400 (8th Cir. 1983).

8. Despite petitioners' claims that the business was "infused with a religious purpose," the Supreme Court held that the lower courts correctly found that the business served the general public "in competition with ordinary commercial enterprises," and the payment of substandard wages gave it an unfair advantage over the competitors. *Tony & Susan Alamo Found.*, 471 U.S. at 299.

9. Such unfair advantage is precisely what the Act was intended to prevent. *Id.*

15

(5:15CV1577)

10.  Defendants assert that "Plaintiff's claims, as applied, violate the [Free Exercise

Clause of the] First Amendment of the United States Constitution."  Answer to Amended

Complaint (ECF No. 83) at PageID #: 2238, ¶ 7.

11.  Exceptions to coverage under the FLSA are "narrow and specific," and employees

who are not exempt from the Act, "remain within the Act."  *Powell v. U.S. Cartridge Co.*, 339

U.S. 497, 517 (1950).

12.  Exemptions from the requirements of the FLSA must be "narrowly construed against

the employers seeking to assert them."  *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496,

501 (6th Cir. 2007) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

13.  FLSA exemptions are affirmative defenses, and the employer bears the burden of

proving the affirmative defense by providing "clear and affirmative evidence that the employee

meets every requirement of an exemption."  *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d

843, 847 (6th Cir. 2012) (quoting *Thomas*, 506 F.3d at 501).

14.  29 C.F.R. § 553.101(a) exempts from certain portions of the Act an individual who

"performs hours of service for a *public agency* for civic, charitable, or humanitarian reasons,

without promise, expectation or receipt of compensation for services rendered . . . ." (emphasis

added).

15.  Even under this regulation – which limits FLSA-exempt volunteerism to labor on

behalf of a public agency – individuals may only be volunteers when their services are "offered

freely and without pressure or coercion, direct or implied, from an employer."  29 C.F.R. §

553.101(c).

16

(5:15CV1577)

16.  Defendants argue that Plaintiff's attempt to prove an employer-employee relationship through alleged religious persuasion to volunteer is invalid under the FLSA and, if adopted, would violate the Free Exercise Clause.  ECF No. 75 at PageID #: 1557-58; ECF No. 76) at PageID #: 1969-70; Defendants' Memorandum in Support of Motion to Dismiss and Renewed Motion for Summary Judgment (ECF No. 80) at PageID #: 2109-18; ECF No. 85 at PageID #: 2330-34, 2342; Defendants' Post-Trial Brief (ECF No. 87) at PageID #: 2392-2403.

17.  There is no language in the Act or its regulations that creates an exemption based on the workers' motivation – religious or otherwise.  Indeed, the Supreme Court specifically concluded that workers' protestations against receiving wages – due to the workers' religious beliefs – are unavailing because "the purposes of the Act require that it be applied even to those who would decline its protections." *Tony & Susan Alamo Found.*, 471 U.S. at 302.

18.  The Buffet is an enterprise engaged in commerce because its workers handle goods that have moved in commerce, and it had an annual dollar gross volume of sales exceeding $500,000.  ECF No. 36 at PageID #: 1144, ¶¶ 13, 14-16.

19.  The Buffet is a commercial, for-profit institution in competition with a number of other commercial eateries in its immediate vicinity.  ECF No. 36 at PageID #: 1144, ¶ 12; ECF No. 76 at PageID #: 1878-79.

20.  Defendants stress the alleged religious purpose served by the Buffet and its ability to provide low-cost meals.  ECF No. 75 at PageID #: 1689, 1697, 1699; ECF No. 76 at PageID #: 1839-40; ECF No. 85 at PageID #: 2368.

(5:15CV1577)

21.  But they undoubtedly achieve those low prices, at least in part, by circumventing wage laws and maintaining a workforce that is largely unpaid.

22.  Indeed, Reverend Angley admitted that the Buffet reverted to using volunteers as a cost-saving measure.

23.  As noted in *Tony & Susan Alamo Found.*, 471 U.S. at 299, the Act was intended to prevent businesses from achieving a competitive advantage by paying substandard (or in this case zero) wages to workers.

24.  Defendants adduced no evidence at trial that the Buffet or Reverend Angley are eligible to claim any exceptions from coverage under the Act.

25.  The only possible FLSA exemption Defendants might rely on could be 29 C.F.R. § 553.101, but Defendants do not meet the requirements of this exemption.

26.  Defendants failed to demonstrate that the work was on behalf of a public agency.

27.  Moreover, Plaintiff introduced compelling evidence that the volunteers felt coerced or pressured to work at the Buffet.

28.  Despite the Buffet's association with a religious institution, it is still engaged in commerce and, therefore, subject to the minimum wage requirements of the Act.

**III.  Volunteers As Employees**

29.  An employer under the FLSA is "any person acting directly or indirectly in the interest of an employer in relation to an employee. . . ." *U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 778 (6th Cir. 1995) (quoting 29 U.S.C. § 203(d)).

30.  An employee is "any individual employed by an employer." 29 U.S.C. § 203(e)(1).

18

(5:15CV1577)

31.  "The FLSA's definition of 'employee' is strikingly broad and 'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'" *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804 (6th Cir. 2015) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

32.  To "employ" means "to suffer or permit to work." 29 U.S.C. § 203(g).

33.  "A broader or more comprehensive coverage of employees . . . would be difficult to frame." *United States. v. Rosenwasser*, 323 U.S. 360, 362 (1945).

34.  There is no language in the Act or its regulations regarding the use of volunteer labor at for-profit companies.  But, the Department of Labor has clarified that "[u]nder the FLSA, individuals may not volunteer services to private sector for profit employers." Wage and Hour Division, Opinion Letter Fair Labor Standards Act, 1999 WL 1788145, at *2 (Aug. 19, 1999) (emphasis in original).

35.  Despite the Department of Labor's stated position, courts have suggested that there may be very narrow instances where a worker may provide his labor to a for-profit institution without being owed compensation under the FLSA.

36.  In *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), the Supreme Court considered whether unpaid trainees at a railroad were subject to the FLSA.  As a part of their training, the trainees learned the work first by observation, then under close scrutiny. *Id.* at 149.

37.  The trainees did not displace any employees because the employees were the ones who did most of the work, or they remained nearby to supervise the trainees. *Id.* at 150.

19

(5:15CV1577)

38.  The trainees' work did not expedite the railroad's work and may have even impeded it.  *Id.*

39.  Only after completing the training could the trainees be included in the pool of available railroad employees for future jobs.  *Id.*

40.  The Supreme Court noted that despite the broad sweep of the FLSA, a person who, "without promise or expectation of compensation, but *solely for his personal purpose or pleasure*" works in activities carried out by others, should not be subject to the Act.  *Id.* at 152 (emphasis added).

41.  The Court noted that the worker, "whose work serves *only* his own interest" should not be covered by the Act, which "was not intended to penalize railroads for providing, free of charge, the same kind of instruction [as a school] in a manner which would most greatly benefit the trainees."  *Id.* at 152-53 (emphasis added).

42. The Court held that the trainees were not employees under the FLSA, given that the railroads received "no 'immediate advantage' from any work done by the trainees."  *Id.* at 153. *See also Archie v. Grand Cent. Partnership, Inc.*, 997 F. Supp. 504, 535 (S.D.N.Y. 1998) (finding that the employer received an immediate advantage – an advantage that outweighed any advantage to the workers – and therefore concluding that workers were employees for purposes of the FLSA); *McLaughlin v. Ensley*, 877 F.2d 1207, 1209 (4th Cir. 1989) (finding that whether a trainee is an employee subject to the Act revolves around the question of whether the employer is the primary beneficiary of the trainee's labor).

20

(5:15CV1577)

43. Later, in *Tony & Susan Alamo Found.*, the Supreme Court did not analyze, as it had in *Portland Terminal*, whether the workers were working solely for their own purpose or pleasure or whether the employer received any advantage from the work. Instead, the Supreme Court merely concluded that the workers, who worked at a commercial venture owned by a charity, were employees "because they work in contemplation of compensation." 471 U.S. at 306.

44. In *Tony & Susan Alamo Found.*, the Supreme Court built upon the *Portland Terminal* decision by focusing on the workers' expectation of compensation, but did not hold that expectation of compensation is the sole consideration for determining whether a worker is an employee.

45. In fact, the Court specifically rejected witnesses' protestations against being compensated, noting that, "[i]f an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Tony & Susan Alamo Found.*, 471 U.S. at 302.

46. Broadening the exceptions from the Act in such a fashion "would [ ] likely [ ] exert a general downward pressure on wages in competing businesses" – a disfavored result. *Id.*

47. Instead, the Supreme Court instructed that the facts should be viewed in light of the "economic reality." *Id.* at 301.

48. The Sixth Circuit has noted that this "economic reality" standard is not "susceptible to formulaic application." *Ellington v. East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012).

21

(5:15CV1577)

49.  Instead, it requires looking at the totality of the circumstances.  *Id.*

50.  Some relevant factors to consider include:

A.  Whether the worker is an integral part of the operations of the putative employer;

B.  The extent of the worker's economic dependence on the employer;

C.  The employer's substantial control of the terms and conditions of the work of the worker;

D.  The employer's authority to hire or fire the worker; and

E.  Whether the employer maintains the worker's employment records and establishes the rate and method of payment.

*Id.* (citing *Dunlop v. Dr. Pepper-Pepsi Cola Bottling Co. of Dyersburg, Tenn., Inc.*, 529 F.2d 298, 301 (6th Cir. 1976); *Falk v. Brennan*, 414 U.S. 190, 195 (1973); *Braddock v. Madison Cnty.*, 34 F. Supp.2d 1098, 1107 (S.D. Ind. 1998)).

51.  Despite having signed separate affidavits stating at paragraph 8 or 9 "[t]hat although I provided services to the Cathedral Buffet as a volunteer, I do not believe that the services I performed were integral to the Cathedral Buffet's business," Clay Ether, Leah Barrows, Wanda Buckner, Lisa Poindexter, and Joshoua Bell testified that they did not know what it means for their work to be integral to the Buffet's business.  ECF No. 78 at PageID #: 1993-94, 2007-2008, 2022, 2036, 2090, 2097.  Bell testified on redirect:

**Q.**     . . . So when you signed [the Affidavit (ECF No. 26-18)], what did you understand [paragraph 8] to mean?
**A.**     That it was needful for me to be there.  And basically, that I couldn't be replaced.  And that I was doing it as a volunteer as a helping hand.

22

(5:15CV1577)

ECF No. 78 at PageID #: 2098.

52. None of these factors is dispositive, and the court should "transcend traditional concepts of the employer-employee relationship and assess the economic realities presented by the facts . . . ." *Ellington*, 689 F. 3d at 555 (quoting *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991)). *See also Okoro v. Pyramid 4 Aegis*, No. 11-C-267, 2012 WL 1410025, at *9 (E.D. Wis. April 23, 2012) (noting the importance of viewing the totality of the circumstances when deciding whether a worker is an employee).

53. Given the FLSA's purposefully broad scope and the lack of any specific exemptions for volunteerism in private, for-profit institutions, the analysis of whether the Buffet's volunteers are employees requires an analysis of the economic realities of the situation.

54. The economic realities of the situation in the case at bar suggest that the volunteers used by the Buffet were actually employees, and that the Buffet's main purpose in using the volunteers was to save money.

55. The Buffet claims that the volunteers desired to provide volunteer time to the Buffet in furtherance of the Church's mission and that the Buffet was merely trying to accommodate such desires. *See, e.g.*, ECF No. 75 at PageID #: 1589-90; ECF No. 87 at PageID #: 2386, 2390, 2394-96; Defendants' Exhibit 3; ECF Nos. 39-1 through 28; ECF No. 57.

56. Reverend Angley even claimed that some people love to volunteer, and Neale actually claimed that having volunteers at the Buffet was a burden.

57. But, despite allegedly finding the volunteers a burden, Neale regularly asked Reverend Angley to announce that the Buffet needed volunteers, Angley regularly solicited

(5:15CV1577)

Buffet volunteers from the pulpit, and Stacey McClintock often called and asked people to volunteer.

58.  The Buffet's constant solicitation of volunteer labor, Reverend Angley's admissions that the use of volunteer labor was intended to save money, and the volunteers' feelings of pressure and coercion to provide the labor all demonstrate that the volunteers were actually employees.

59.  In addition, the volunteers' work was clearly integral to the Buffet's operations, in that they did work that was necessary to the operation of a restaurant, such as cleaning, bussing tables, stocking the buffet, chopping vegetables, and operating the cash registers.

60.  It is hard to fathom that a restaurant could operate without such work being completed.

61. During her testimony, Neale admitted that if the volunteers did not perform this work, paid employees would need to do it.

62.  Moreover, the volunteers were doing work very similar to that of the Buffet's paid staff, including working in the dish room or working at the cash registers.

63.  There was no way for a customer to distinguish a paid staff member from an unpaid volunteer.

64.  Testimony at trial also demonstrated the high level of supervision and control exerted by the Buffet's management over the volunteers.

65.  "There is a much different degree of control when an individual must work at a time definitively set by an employer for its own benefit than when the individual has the flexibility to

24

(5:15CV1577)

craft her schedule as it suits her." *Marie v. American Red Cross*, 771 F.3d 344, 357 (6th Cir. 2014).

66. Some of the volunteers testified that they felt pressured or coerced to offer their services to the Buffet.

67. Then, once at the Buffet, they were trained and supervised by the Buffet's managers.

68. Defendants' position is that even if a for-profit employer is covered under the FLSA, its workers do not need to be paid a minimum wage if the worker has no expectation of compensation for providing volunteer services. *See* ECF No. 87 at PageID #: 2390-92.

69. Such a reading of the FLSA and its case law clearly violates the intent and purpose of the Act, and would create the result that the Supreme Court in *Tony & Susan Alamo Found.* explicitly sought to avoid, *i.e.*, that employers would be "able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." 471 U.S. at 302.

70. The Court's decision today does not, as was assured by the Supreme Court in *Tony & Susan Alamo Found.*, infringe upon the Church members' ability to engage in "ordinary volunteerism," such as driving the elderly to church, helping to remodel a church home for the needy, or engaging in other charitable acts. *Id.* at 302-303. It does, however, prevent the Buffet from exploiting free labor from individuals in furtherance of its commercial, for-profit activities.

## IV. The Buffet and Reverend Angley as § 3(d) Employers

71. As described above, an "employer" is one who directly or indirectly acts "in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

(5:15CV1577)

72. One who controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an "employer" for the purposes of the FLSA. *Dole*, 942 F.2d at 966. *See also U.S. Dept. of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775 (6th Cir. 1995) and *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (same).

73. But exclusive control over day-to-day functions is not necessary; "[t]he party need only have 'operational control of *significant aspects* of the corporation's day to day functions.'" *Dole*, 942 F.2d at 966 (emphasis in original) (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1514 (1st Cir. 1983)).

74. Ownership in the business is also not critical to defining a 3(d) employer under the Act. *See Cook v. Carestar, Inc.*, No. 2:11-CV-00691, 2013 WL 5477148, at *10 (S.D. Ohio Sept. 16, 2013) (finding ownership not dispositive, but a showing that an individual exerts the greatest amount of control suggests that he is an employer under the FLSA) and *Manning v. Boston Medical Ctr. Corp.*, 725 F.3d 34, 48 (1st Cir. 2013) (noting that an ownership interest or high-level executive position would not be necessary to show that someone was an employer).

75. Rather, the focus is on whether the individual has a "strong degree of authority over the corporation's finances" and whether he can "caus[e] the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits." *Manning*, 725 F.3d at 48 (quoting *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998)). One who "effectively dominates [a corporation's] administration or otherwise acts, or has the power to act" on behalf of the corporation is an employer under § 3(d) of the Act. *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194-95 (5th Cir.), *cert denied*, 463

26

(5:15CV1577)

U.S. 1207 (1983), *abrogated on other grounds by McLaughlin v. Richland Shoe Company*, 486

U.S. 128, 132-33 (1988). *See also Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 140 (2d

Cir. 1999).

76. Ultimately courts are entrusted to "transcend traditional concepts of the

employer-employee relationship" and instead analyze "the economic realities presented by the

facts." *Dole*, 942 F.2d at 965 (quoting *Sabine Irrigation*, 695 F.2d at 195).

77. The Buffet is an employer under the Act because it clearly exerts day to day control

over the work done at the restaurant, and the Court does not believe there is any dispute among

the parties on this issue.

78. Reverend Angley also has significant control and authority over the operations of the

Buffet and is an employer pursuant to § 3(d) of the Act.

79. First and foremost, Reverend Angley unilaterally made the decision to revert to using

volunteers.

80. Such power, on its own, demonstrates the influence Reverend Angley wields over the

Buffet.

81. In addition, Reverend Angley hired Sonya Neale, the current general manager, and

hired other individuals for the Buffet.

82. Neale also testified that she reports to Reverend Angley.

83. Reverend Angley could have access to employee records and bank accounts.

(5:15CV1577)

84.  Reverend Angley would expect to be involved in major purchasing decisions and was not aware of a single instance when Neale has gone against his advice or recommendations as they relate to the Buffet.

85.  Reverend Angley has the power to act on behalf of the Buffet and has significant influence over it, making him a 3(d) employer under the Act.

**V.  Successor Liability**

86.  To determine whether a successor may be liable for the acts of a predecessor, courts consider the following three factors:

> A.  The interest of the defendant-employer;
>
> B.  The interest of the plaintiff-employee; and
>
> C.  The goals of federal policy, in light of the particular facts of a case and the particular legal obligation at issue.

*Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 551-52 (6th Cir. 2006) (citing *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1089-91 (6th Cir. 1974) (finding that in the context of an allegation of Title VII discrimination brought by the EEOC, plaintiff had set forth sufficient evidence to suggest that successor liability could be applied, and the district court improperly granted summary judgment to defendant on plaintiff's failure to file a separate charge against the successor)).

87. In *MacMillan*, the Sixth Circuit further refined the foregoing three factors and found the following circumstances relevant to determining whether to impose successor liability:

> A.  Whether the successor company has notice of the charge;

28

(5:15CV1577)

        B.  The ability of the predecessor to provide relief;

        C.  Whether the new employer uses the same plant;

        D.  Whether there has been substantial continuity of business operations;

        E.  Whether the new employer uses the same or substantially the same workforce;

        F.  Whether the new employer uses the same or substantially the same supervisory personnel;

        G.  Whether the same jobs exist under substantially the same working conditions;

        H.  Whether the defendant uses the same machinery, equipment, and methods of production; and

        I.  Whether the defendant produces the same product.

*Cobb*, 452 F.3d at 554 (citing *MacMillan*, 503 F.2d at 1094).

    88.  The foregoing factors have been applied to the question of successor liability in the context of the FLSA.  *See Clark v. Shop24 Global, LLC*, 77 F. Supp.3d 660, 692 (S.D. Ohio 2015) (denying defendants' motion for summary judgment because plaintiff presented sufficient issues of material fact as to successor liability, even though successor liability was not pled in the complaint); *Thompson v. Bruister and Assoc., Inc.*, No. 3:07-00412, 2013 WL 1099796, at *6 (M.D. Tenn. March 15, 2013); *Dowd v. Directv, LLC*, No. 14-cv-14018, 2016 WL 28866, at *7 (E.D. Mich. Jan. 4, 2016); *Comer v. Directv, LLC*, No. 2:14-cv-1986, 2016 WL 853027, at *4 (S.D. Ohio March 4, 2016) (applying successor liability to a FLSA matter); and *Donovan v. Maverick Oil Co.*, No. 5-70949, 1981 WL 2339, at *3 (E.D. Mich. Sept. 18, 1981).

(5:15CV1577)

89. The ultimate question is one of equity because to not allow successor liability "could encourage evasion in the guise of corporate transfers of ownership." *MacMillan*, 503 F.2d at 1092.

90. The Buffet is liable for back wages owed to the volunteers during the period of November 5, 2012, through November 2, 2014, even if the owner of the Buffet changed in 2013.

91. The continuity of operations since at least 1997, when Neale first became general manager, demonstrates that the Buffet should be liable for all of the wages sought by Plaintiff.

92. The Buffet still uses the same physical location for its operations, the workforce is substantially the same, the supervisor (*i.e.*, Neale) is the same, the same working conditions or jobs exist, the equipment used by the Buffet is substantially the same, and the product is the same.

93. To accept Defendants' argument that a change in ownership from Winston to the Church somehow shields the Buffet from liability (ECF No. 87 at PageID #: 2410-11) would be to engage in the precise evasion that the Sixth Circuit sought to avoid in *MacMillan*.

94. Defendants' argument that Plaintiff's failure to plead in the Complaint (ECF No. 1) or otherwise amend his complaint to plead successor liability (ECF No. 87 at PageID #: 2410-11) is similarly unavailing.

95. Defendants have raised the issue of successor liability as a defense, and Plaintiff is under no obligation to amend the Complaint (ECF No. 1) in response to a defense raised by Defendants.

(5:15CV1577)

**VI.  Minimum Wage Violations**

96.  Unless there is an applicable exemption, Section 6 of the Act requires every employer to pay the minimum wage – currently set at $7.25 per hour – to each employee who, in any workweek, is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 206(a); *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2162 (2012).

97.  "Under the Fair Labor Standards Act, all hours worked must be compensated." *Chao v. Akron Insulation and Supply, Inc.*, 184 Fed.Appx. 508, 510 (6th Cir. 2006).

98.  As described in greater detail above, the volunteers were employees and should have been paid the minimum wage of $7.25 per hour.

**VII.  Calculation of Back Wages**

99.  Where an employer has failed to maintain the records of hours worked required by the Act, it is the employer's burden to refute the employee's reconstruction.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, Pub. L. No. 80-49 § 4(a), 61 Stat. 86-87 (codified as 29 U.S.C. 254(a)), *as recognized in Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 516-17 (2014)); *Cole Enterprises*, 62 F.3d at 781; *Chao v. First Nat'l Lending Corp.*, 516 F. Supp.2d 895, 901 (N.D. Ohio 2006) (Nugent, J.).

100.  In *Mt. Clemens*, the Supreme Court held that "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated

31

(5:15CV1577)

and he produces sufficient evidence to show that the amount and extent of that work as a matter of just and reasonable inference." 328 U.S. at 687.  Furthermore, the Supreme Court found that an employer cannot complain that damages lack exactness when he did not make and keep records of hours worked.  *Id.* at 688; *see also Hodgson v. American Concrete Constr. Co., Inc.,* 471 F.2d 1183 (6th Cir. 1973).

101.  As a result, when an employer fails to maintain the requisite records, Plaintiff may estimate damages and shift the burden to the employer to negate the estimated damages.  *O'Brien v. Ed Donnelly Enterprises, Inc.,* 575 F.3d 567, 603 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez,* 136 S. Ct. 663 (2016).

102.  If the employer cannot negate the estimated damages, "then the 'court may award damages to the employee, even though the result be only approximate.'" *Id.* (quoting *Mt. Clemens Pottery,* 328 U.S. at 688).

103.  Defendants did not maintain accurate records of the number of hours worked by the volunteers.

104.  Due to the lack of accurate records, Plaintiff is entitled to estimate the amount of back wages owed to the volunteers.

105.  Defendants admitted in discovery that certain documents they produced to Plaintiff constituted the number of hours worked by the volunteers during the Investigation Period. Investigator Banig testified that he used those documents to calculate the back wages owed to the volunteers.  Because Defendants could not produce evidence of more accurate records of the number of hours worked by the volunteers, the Court adopts the calculations made by

32

(5:15CV1577)

Investigator Banig.  The Court, therefore, finds that the volunteers are owed the amount of back

wages described in the WH-56 summary dated November 17, 2016 (Plaintiff's New/Amended

Exhibit 10) put into evidence by Plaintiff.

**VIII.  Liquidated Damages**

106.  Under Section 16(c) of the Act, a plaintiff is entitled to recover liquidated damages

in an amount equal to the back wages.  29 U.S.C. § 216(c).

107.  "[L]iquidated damages . . . are compensation, not a penalty or punishment."

*McClanahan v. Mathews*, 440 F.2d 320, 322-23 (6th Cir. 1971) (quoting *Overnight Motor*

*Transp. Co. v. Missel*, 316 U.S. 572, 583 (1942), *superseded by statute on other grounds as*

*recognized in Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985)).

108.  Liquidated damages are granted as a matter of course, and courts will not

discretionarily limit or deny liquidated damages unless the employer meets its "substantial"

burden of showing that it acted in good faith and took affirmative steps to ascertain the Act's

requirements.  *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004).

109.  Without proof of such good faith by the employer, "a district court has no power or

discretion to reduce an employer's liability for the equivalent of double unpaid wages."  *Solis v.*

*Min Fang Yang*, 345 Fed.Appx. 35, 39 (6th Cir. 2009) (quoting *Elwell v. Univ. Hosp. Home*

*Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002)).

110.  Defendants were previously investigated by Wage and Hour in 1999, at which time

Wage and Hour informed Defendants that it was inappropriate to use volunteer labor at the

Buffet.

33

(5:15CV1577)

111.  Reverend Angley understood Wage and Hour's position, but nevertheless directed the Buffet to return to using volunteers.

112.  Defendants failed to introduce any evidence suggesting that their decision to return to using volunteers was in good faith.

113.  Given the prior investigation, Reverend Angley and the Buffet's return to using volunteers was not in good faith, and the imposition of liquidated damages is appropriate.

114.  Defendants also failed to introduce evidence that they took affirmative steps to ascertain the Act's requirements, even after having been investigated by Wage and Hour.

115.  Defendants have failed to meet their substantial burden of demonstrating why liquidated damages should not be assessed.  The Court, therefore, finds that Defendants are liable for an equal amount of liquidated damages.

## IX.  Recordkeeping

116.  Section 11(c) of the Act requires employers to "make, keep, and preserve" records of their employees, including their "wages, hours, and other conditions and practices of employment."  29 U.S.C. § 211(c).

117.  As described above, Defendants did not maintain accurate records of the hours worked by the volunteers as required by Section 11(c) of the Act.

## X.  Injunctive Relief

118.  Section 17 of the Act authorizes district courts to restrain employers from future violations of the minimum wage (Section 6) and recordkeeping (Section 11) provisions of the Act, while Section 16 allows Plaintiff to recover costs.

34

(5:15CV1577)

119.  The issuance of an injunction is at the district court's discretion, but such discretion "is not unbridled." *Martin v. Funtime, Inc.*, 963 F.2d 110, 113 (6th Cir. 1992).

120.  Indeed, when exercising such discretion, the district court "must give 'substantial weight to the fact that the Secretary seeks to vindicate a public, and not a private, right.'" *Id.* (quoting *Brock v. Big Bear Mkt. No. 3*, 825 F.2d 1381, 1383 (9th Cir. 1987)).

121.  The court's primary concern is with whether the employer is likely to violate the Act in the future, and "an employer's pattern of repetitive violations or a finding of bad faith are factors weighing heavily in favor of granting a prospective injunction." *Funtime, Inc.*, 963 F.2d at 114 (quoting *Big Bear*, 825 F.2d at 1383).

122.  Despite having been informed by Wage and Hour in 1999 that volunteer labor at the Buffet was subject to wages under the FLSA, Defendants made the decision to revert to using volunteers.

123.  In exercising its discretion, a court should consider:  "(1) the previous conduct of the employer; (2) the current conduct of the employer; and (3) the dependability of the employer's promises for future compliance." *Reich v. Petroleum Sales, Inc.*, 30 F.3d 654, 657 (6th Cir. 1994).  In view of the above, the Court concludes Plaintiff has demonstrated all of the factors that a court must consider when deciding whether an injunction is warranted.

124.  Defendants' repeated violations of the Act, viewed in light of Plaintiff's need to vindicate the public rights bestowed by the FLSA, demonstrate Defendants' bad faith.  As a result, the Court enjoins Defendants from violating Sections 6 and 11 of the Act.

(5:15CV1577)

125.  Defendants' Motion for Partial Summary Judgment (ECF No. 26) was merged into

the bench trial.  *See* ECF No. 75 at PageID #: 1544; ECF No. 76 at PageID #: 1972-73; ECF No.

85 at PageID #: 2320, 2355.  The Court also deferred until the conclusion of the case its decision

on Defendants' Motion to Dismiss and Renewed Motion for Summary Judgment (ECF No. 81).

ECF No. 85 at PageID #: 2357.  For the foregoing reasons, Defendants' Motion for Partial

Summary Judgment (ECF No. 26) and Motion to Dismiss and Renewed Motion for Summary

Judgment (ECF No. 81) are denied.


        IT IS SO ORDERED.


  March 29, 2017                          /s/ Benita Y. Pearson
Date                                    Benita Y. Pearson
                                        United States District Judge

36